# In The United States Court of Federal Claims

No. 06-383T

(Filed:  April 9, 2008)
_____

| | | |
|---|---|---|
| HARRY G. SCHORTMANN, JR., and | * | Contract action; Motion for summary |
| JACQUELINE SCHORTMANN, | * | judgment; Interest deriving from an |
| | * | overassessment based on an IRS Form 870- |
| Plaintiffs, | * | AD; Sovereign immunity; *Library of* |
| | * | *Congress v. Shaw*; 26 U.S.C. § 6611; |
| v. | * | Construction of agreement; 26 U.S.C. § 1341 |
| | * | – claim of right; 26 U.S.C. § 1311 – |
| THE UNITED STATES, | * | mitigation; Form 870-AD either ambiguous |
| | * | or missing an essential term; Extrinsic |
| Defendant. | * | evidence permitted; Material questions of |
| | * | fact preclude granting summary judgment. |

_____

### OPINION

_____

*Mary Elizabeth Rinaldi* and *Miriam L. Fisher,* Morgan, Lewis & Bockius, LLP, Washington, D.C., for plaintiffs.

*Jacob E. Christensen*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Richard T. Morrison*, for defendant.

**ALLEGRA, Judge:**

> "It is of the highest importance in the art of detection to be able to recognise out of a number of facts which are incidental and which are vital." . . . .  "Is there any point to which you wish to draw my attention?"  "To the curious incident of the dog in the night-time."  "The dog did nothing in the night time."  "That was the curious incident," remarked Holmes.[1]

This action, which is before the court on defendant's motion for summary judgment, has its genesis in a settlement entered into by the parties to resolve a claim for refund.  The parties dispute whether the plaintiffs, Harry Schortmann, Jr. and his wife, Jacqueline Shortmann, are

---

[1]  Arthur Conan Doyle, The Complete Sherlock Holmes, Memoirs of Sherlock Holmes, Silver Blaze 346-47 (Doubleday 1930) (Sherlock Holmes conversing with Inspector Gregory); *see also Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) (Rehnquist, C.J.).

entitled to receive additional interest on the refunds of their income tax made with respect to their taxable years 1986 through 1996.  For the reasons that follow, the court concludes that the existence of genuine and material questions of fact obliges it to deny defendant's motion.

## I.      BACKGROUND

Were he to tell the tale of this case, that great sleuth, Sherlock Holmes, might call it (between puffs of his Wellington) – *The Case of the Cryptic Code*.

Our story begins in 1978, when Mr. Schortmann retired from his job as an air traffic controller due to a debilitating illness.  Over the next twenty years, he received retirement benefits from the Office of Personnel Management (OPM).  Each year, he and his wife reported those payments as income on their Federal income tax return and paid the tax thereon.  In 1997, however, the Office of Workers' Compensation (OWC) determined that Mr. Shortmann should have received disability payments from his retirement in 1978 through 1997, payments that were not taxable under 26 U.S.C. § 104(a).  OWC repaid OPM a total of $222,739 that the latter agency had paid to Mr. Schortmann and assumed the obligation to make further disability payments to him.  On their 1997 income tax return, plaintiffs claimed a refund of $36,772.60 for the taxes they paid on the disability benefits from 1978 through 1997.  To the right of this entry on the refund claim, they typed "I.R.C. 1341," an apparent reference to 26 U.S.C. § 1341, which deals with the computation of tax where a taxpayer restores certain amounts previously held under a so-called "claim of right."

In 1999, the IRS Appeals Office determined that plaintiffs were entitled to an overpayment of tax in the amount of $36,165.00 (the slight difference between this figure and the $36,772.60 claimed is not relevant herein).  On April 20, 1999, plaintiff executed a settlement agreement with the Appeals Office, embodied in a Form 870-AD.  Stock language in that form stated –

> Under the provisions of section 6213(d) of the Internal Revenue Code of 1986 (the Code), or corresponding provisions of prior internal revenue laws, the undersigned offers to waive the restrictions provided in section 6213(a) of the Code or corresponding provisions of prior internal revenue laws, and to consent to the assessment and collection of the following deficiencies and additions to tax, if any, with interest as provided by law.  The undersigned offers also to accept the following overassessments, if any, as correct.  Any waiver or acceptance of an overassessment is subject to any terms and conditions stated below and on the reverse side of this form.

The following additional information was recorded in the form –

| Deficiencies (Overassessments) and Additions to Tax | | | | | | |
|---|---|---|---|---|---|---|
| Year Ended | Kind of Tax | Tax | | | | |
| 12/31/97* | Income | $(36,165) | $ | $ | | |
| (Claim)* | | | | | | |

Curiously, this form referenced neither an explicit amount of interest to be paid on the overassessment indicated nor any method for calculating that interest. To effectuate the settlement, plaintiffs also executed IRS Forms 3363 (Acceptance of Proposed Disallowance of Claim for Refund or Credit) and 2297 (Waiver of Statutory Notification of Claim Disallowance), with both forms reflecting that $608 of their claimed refund had been "disallowed."

On May 27, 1999, the IRS sent plaintiffs a letter notifying them that it was completing the processing of the settlement. The letter indicated that "[w]e will adjust your account and figure the interest," adding that "[i]f you are due a refund, the Service Center will send it within 60 days from the date of this letter." IRS records reflect that, on July 14, 1999, the Chief of the IRS New England Appeals Office signed a memorandum, conspicuously entitled "SCHORTMANN, H&J – 1997 (Claim), Barred YRS: 1995 thru 1986 – Section 1311." This memorandum stated as follows:

> At Appeals, this case was settled in accordance with Section 1.1341-1(a)(2) of the Regulations. Section 1341 alleviates the inequity caused by timing differences.
>
> Assessments, refunds and credits which otherwise would be barred by the statute of limitations, or other rules of law may be allowed to correct specified errors under the mitigation provision of Code Section 1311. Therefore, in accordance with Section 1311, the taxpayers will be allowed refunds as outlined in Appeals transmittal for tax years 1995 thru 1986. (1996 yr also included but not barred).

Attached to this memorandum was an IRS internal routing sheet, signed by an employee in the New England Appeals Office, which indicates that "[p]er discussion with Chief, Appeals . . . it was agreed that interest would be refunded on the following years from the due date of the return: 1996, 1995, 1994, 1993, 1992, 1991. The remaining years 1990, 1989, 1988[,] 1987 and 1986 will have no interest refunded." Attached to this slip was an "Appeals Case Memorandum," which concluded that plaintiffs' situation came under section 1341(a) of the Code. The memorandum concluded that "[e]quity requires that the taxpayer be allowed to reduce his tax in the restoration year by the amount paid on the restored income in the year of inclusion because, had the absence of a right to the income been known, the item would not have been included and no tax would have been due."

From August to November of 1999, the IRS issued eleven separate checks to plaintiffs, in three batches, with each check corresponding to plaintiffs' taxable years 1986 through 1996, respectively. In total, the IRS refunded plaintiffs $36,165 in tax, as well as $6,533.85 in interest.

Plaintiffs, though, felt that the interest awarded them was insufficient.  On June 28, 2006, they filed a complaint in this court seeking unpaid interest, as well as compensatory and punitive damages and attorney's fees and costs.  They allege, *inter alia*, that defendant has failed to pay all the interest owed under the aforementioned settlement agreement.  On August 28, 2006, defendant answered plaintiffs' complaint and filed a partial motion to dismiss.  On December 8, 2006, plaintiffs filed a motion to transfer their complaint to the United States District Court for the District of Massachusetts.  Defendant opposed the latter motion.  On January 12, 2007, the court dismissed the portions of plaintiffs' complaint that requested relief unavailable in this court (*e.g.*, punitive damages) and denied plaintiffs' motion to transfer the case, finding that this court has exclusive jurisdiction over this matter.  On February 21, 2007, defendant filed a motion for summary judgment, asserting that plaintiffs had received all the interest they were owed.[2]  Thereafter, the firm of Morgan, Lewis and Bockius agreed to represent plaintiffs, *pro bono*.  Subsequently, briefing on defendant's motion for summary judgment was completed.  Oral argument on the motion was held on November 2, 2007.  Following that argument, the court ordered defendant to file a memorandum concerning the application of *Library of Congress v. Shaw*, 478 U.S. 310 (1986) to this case, or, alternatively, a notice that it would not pursue that argument.  On November 29, 2007, defendant filed a memorandum arguing that *Library of Congress* entitled it to judgment as a matter of law.  On January 9, 2008, plaintiffs filed a response to this memorandum.

## II.    DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Arko Executive Servs. v. United States*, 78 Fed. Cl. 420, 423 (2007).   Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.  However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Id*.; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004).  Rather, the court must determine whether the evidence presents a disagreement sufficient to require fact finding, or whether it is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 250-52; *Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 748-49 (2006).  In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn

---

[2]  While defendant asserts that plaintiffs received approximately $2,400 more in interest than to which they were entitled, it has not pursued a counterclaim.

from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also Lockheed Martin*, 70 Fed. Cl. at 749; *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

### A.    Sovereign Immunity.

This case presents an interesting interplay between tax and contract law, with the ultimate resolution herein lying at the end of a labyrinthine path through the mean streets and back alleys of these two complex subjects. The parties initially framed the question here as one of contract law – whether the Form 870-AD, by its terms, provided for interest on the overassessment here. But, it turned out that the only "interest" provision on the face of the Form 870-AD dealt not with "overassessments," but only with deficiencies and additions to tax. Once this was "discovered," the parties' attention turned elsewhere. Relying primarily on *Library of Congress*, defendant now asserts that the failure to include a specific provision in the Form 870-AD awarding interest on an overassessment means that, under sovereign immunity principles, plaintiffs are barred from recovering any additional interest. Not so, plaintiffs contend, noting that the requisite waiver of sovereign immunity is supplied by section 6611 of the Code.

"When the United States enters into contract relations," the Supreme Court said long ago, "its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 376 (2006). Ordinarily, then, sovereign immunity principles do not alter the normal rules associated with the construction of contracts. But, there are exceptions, albeit ones that do not disprove the rule. Defendant asserts that one of these derives from *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 659 (1947), in which the Supreme Court enunciated what defendant refers to as the "no-interest" rule, thusly:

> Thus, there can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.

The Court elaborated on this rule in *Library of Congress*, in which it held that Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. §§ 2000e, *et seq.*, did not waive the federal government's immunity from interest. There, it noted that under the "no- interest" rule, the United States occupies a favored position, requiring an award of interest to be explicitly granted. *Library of Congress,* 478 U.S. at 314. By way of rationale, it explained:

> In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award. This requirement of a separate waiver reflects the historical view that interest is an element of damages separate from damages on the substantive

claim.  Because interest was generally presumed not to be within the
contemplation of the parties, common-law courts in England allowed interest by
way of damages only when founded upon agreement of the parties.  In turn, the
agreement-basis of interest was adopted by American courts.  Gradually, in suits
between private parties, the necessity of an agreement faded.  The agreement
requirement assumed special force when applied to claims for interest against the
United States.  As sovereign, the United States, in the absence of its consent, is
immune from suit.  This basic rule of sovereign immunity, in conjunction with the
requirement of an agreement to pay interest, gave rise to the rule that interest
cannot be recovered unless the award of interest was affirmatively and separately
contemplated by Congress.

*Id.* at 314-15 (internal citations omitted); *see also Crowley v. United States*, 57 Fed. Cl. 376, 379
(2003).  Describing this "no-interest rule" as "an added gloss of strictness upon" the normal
sovereign immunity rules, the Court concluded that "in the absence of specific provisions by
contract or statute, or 'express consent . . . by Congress,' interest does not run on a claim against
the United States."  *Library of Congress*, 478 U.S. at 317 (quoting *United States v. Louisiana*, 46
U.S. 253, 264-65 (1980)).

        In the wake of these precedents, it has often been said that "the waiver for sovereign
immunity for interest must be distinct from a general waiver of immunity for the cause of action
resulting in the damages award against the United States."  *Marathon Oil Co. v. United States*,
374 F.3d 1123, 1126-27 (Fed. Cir. 2004); *see also United States v. Mescalero Apache Tribe*, 518
F.2d 1309, 1316 (Ct. Cl. 1975).  Defendant argues that this "no-interest" rule prohibits an award
of interest here – that the absence of any explicit provision in the Form 870-AD awarding interest
on overpayments is fatal to plaintiffs' cause.  The implications of this argument are troubling.  If
no interest is awardable here, then presumably the same would be true in any case involving a
standard Form 870-AD reflecting an overassessment, unless an explicit provision for interest was
inserted into the agreement.  Of course, this is not a two-way street for, as noted, the printed
language on the Form 870-AD plainly indicates that the taxpayer consents to the "assessment and
collection of . . . deficiencies and additions to tax, if any, ***with interest as provided by law***."
(Emphasis added).  Can it really be that the pre-printed Form 870-AD is a trap for the unwary?
That, by failing to include any language providing for interest on overassessment, that form
deprives the taxpayer of such interest?  Such a result would seem particularly anomalous in
mutual concession settlements – for which the Form 870-AD was designed – which often entail
offsetting adjustments to income or deductions, *see, e.g.*, Internal Revenue Manual § 8.6.4.1.1.  If
defendant is correct, taxpayers executing Forms 870-AD are in for a shock – via the standard
language in the form, they will have agreed to pay interest on any resulting deficiency, but
without making provision for receiving interest on any corresponding overassessment (and with
the latter omission, in defendant's view, conclusively denying interest on sovereign immunity
grounds).

        Fortunately, as plaintiffs note, there is a simple response to all this ado, found in section
6611 of the Code.  Subparagraph (a) of that section states that "[i]nterest shall be allowed and

paid upon any overpayment in respect of any internal revenue tax at the overpayment rate established under section 6621." Subparagraph (b)(2) thereof further provides that "[s]uch interest shall be allowed and paid" from "the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days." The language of this section is too explicit to be misunderstood. It means what it says – that the United States has waived its sovereign immunity to "authorize[] the allowance of interest on 'any overpayment.'" *Gen. Elec. Co. & Subs. v. United States*, 384 F.3d 1307, 1311 (Fed. Cir. 2004); *see also* Treas. Reg. § 301.6611-1(a). Every case to consider this question has so held. *See E.W. Scripps Co. & Subs. v. United States*, 420 F.3d 589, 597 (6th Cir. 2005) ("Congress, in enacting 26 U.S.C. § 6611 . . . has made clear that it believes that taxpayers should be compensated for the lost time-value of their money when they make an overpayment of tax."); *Gen Elec. Co. & Subs. v. United States*, 56 Fed. Cl. 488, 497 (2003), *aff'd*, 384 F.3d 1307 (Fed. Cir. 2004) ("such a waiver exists in section 6611"); *MNOPF Trustees Ltd. v. United States*, 33 Fed. Cl. 755, 757 (1995), *mod. on other grounds*, 123 F.3d 1460 (Fed. Cir. 1997) (noting that this statute "mandates ('shall') that interest be allowed upon an 'overpayment'"); *Triangle Corp. v. United States*, 592 F. Supp. 1316, 1317 (D. Conn. 1984) ("Interest on overpayments must be paid a taxpayer meriting a refund."); *see also Int'l Bus. Machs. Corp. v. United States*, 201 F.3d 1367, 1374-75 (Fed. Cir. 2000), *cert. denied*, 531 U.S. 1183 (2001).[3]

In *Marsh & McLennan Cos., Inc. v. United States*, 50 Fed. Cl. 140, 146 (2001), *aff'd*, 302 F.3d 1369 (Fed. Cir. 2002), *cert. denied*, 538 U.S. 925 (2003), this court, indeed, made short shrift of the government's argument that the "no-interest rule" required a taxpayer to point to a waiver other than section 6611 in seeking interest on a tax overpayment. In that case, Marsh overpaid its 1985, 1986, 1987 and 1988 federal income taxes. When it filed its 1987 return, it elected to apply the overpayment to its 1988 tax liability, and, the following year, in its 1988 return, it elected to apply an overpayment to its 1989 tax liability. In 1989, the IRS applied Marsh's 1985 overpayment and a portion of its 1986 overpayment to its 1987 account and applied the remainder of the 1986 overpayment and the 1987 credit elect to Marsh's 1988 account. Later, in 1994, the IRS determined that Marsh had underpaid its 1987 and 1988 taxes, leading to a debate over how much interest Marsh should have received on its 1985 and 1986 overpayments. Describing defendant's position on this issue, the court noted that "[d]efendant inveighs that sovereign immunity prohibits an award of interest on the overpayment in this case" based upon *Library of Congress. Marsh & McLennan*, 50 Fed. Cl. at 146. Rejecting defendant's assertion that plaintiff had cited no such waiver, the court observed that "[t]his is a rather arch statement, considering that the majority of defendant's and plaintiff's arguments are directed to just such a statute explicitly authorizing the payment of overpayment interest – I.R.C. § 6111(b)(1)." *Id.* Further underscoring the obviousness of this waiver, the court concluded that "the issue in this case is not whether the United States is obligated to pay interest, but to what extent the United States is obligated to pay interest to plaintiff." *Id.*

---

[3] Indeed, in other cases involving tax settlements, defendant has argued that section 6611 is the controlling waiver provision regarding interest. *See, e.g.*, *Doolin v. United States*, 918 F.2d 15, 19 (9th Cir. 1990) ("The government replies that section 6611 . . . is a waiver of governmental immunity").

Nothing suggests – certainly nothing defendant has cited – that there must be not one, but *two* waivers of sovereign immunity here, *i.e.*, both in the statute *and* the Form 870-AD. *Per contra*. One waiver – section 6611 – suffices. Indeed, the abiding presence of that section explains why, in the ordinary course, the Form 870-AD does not expressly provide for the payment of interest on overassessments. Simply put, where that form leads to an overassessment, section 6611 is triggered, unless the settlement (or, perhaps, some other provision of the Code) provides otherwise. *See Union Pacific R. Co. v. United States*, 847 F.2d 1567, 1569 (Fed. Cir. 1988). Therefore, the court concludes that defendant has waived its immunity and that the "no-interest" rule imposes no bar to the recovery of interest here. Rather, as was true in *Marsh & McLennan*, the question here is not whether the United States has waived its immunity to pay interest on overassessments, but how, if at all, that obligation is modified by the specifics of what occurred here, particularly, the absence of any interesting-granting language in the Form 870-AD.[4]

**B.      Construing the Form 870-AD**.

With defendant's sovereign immunity arguments dispatched, "the plot," as they say, "thickens."[5] The focus here turns back, at least initially, to the Form 870-AD signed by the parties. Defendant asseverates that the absence of any provision in this form involving interest on overassessments means that there was no meeting of the minds on that point. Plaintiffs respond that the court should approach this situation as one involving a contract in which there was an omitted essential term and contend that the court must consider extrinsic evidence to determine what is reasonable under the circumstances. But, is the Form 870-AD here truly silent on the interest question or does it, like the dog that did not bark, yield clues as to the proper amount of interest owed here? To solve this puzzle, we begin by viewing the Form 870-AD through the lens of the legal reasoning employed by the IRS in determining that there was an overassessment here.

---

[4] Defendant's reflexive reliance on sovereign immunity in this case (albeit prompted by a question posed by the court) brings to mind Judge Cardozo's oft-quoted admonition that "[t]he exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced." *Anderson v. John L. Hayes Constr. Co.*, 153 N.E. 28, 29-30 (N.Y. 1926). Justice Frankfurter once expressed similar views: "Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it." *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *see also Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 771 (2004).

[5] Arthur Conan Doyle, The Complete Sherlock Holmes, A Study in Scarlet 46 (Doubleday 1930).

Both plaintiffs in their 1997 tax return, as well as some IRS employees in internal memoranda, pointed to section 1341 of the Code as giving rise to that overassessment.  In pertinent part, that section provides –

**Section 1341.  Computation of tax where taxpayer restores**

(a) General Rule. -If–

> (1)  an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

> (2)  a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

> (3)  the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

>> (i) the tax for the taxable year computed with such deduction; or

>> (ii) an amount equal to-

>> (A) the tax for the taxable year computed without such deduction, minus

>> (B) the decrease in tax under this chapter ... for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

As described in *Cinergy Corp. v. United States*, 55 Fed. Cl. 489, 501 (2003), in order to qualify for this treatment, a taxpayer must prove two things, *to wit*, that:  (i) "an item was included in its gross income for prior taxable years because of an apparent unrestricted right to such item;" and (ii) "in a later tax year, it no longer had an unrestricted right to that item and that the repayment was deductible under some provision of the Code."  *See also United States v. Skelly Oil Co.*, 394 U.S. 678, 683 (1969); *Bailey v. Comm'r of Internal Revenue*, 756 F.2d 44, 47 (6th Cir. 1985).[6]

---

[6]  This formulation tracks Treas. Reg. § 1.1341-1(a)(2), which defines the statute's requirements in the following terms:

"Where these requirements are met," this court has stated, "'[section] 1341 is designed to put the taxpayer in essentially the same position [it] would have been in had [it] never received the returned income." *Cinergy*, 55 Fed. Cl. at 501 (quoting *Dominion Resources, Inc. v. United States*, 219 F.3d 359, 363 (4th Cir. 2000))*; see also Bailey*, 756 F.2d at 46 ("Section 1341, in effect, gives a taxpayer benefits that would approximate a deduction in the year of receipt of the amount later restored when doing so results in a lower tax.").

At first blush, one might conclude that section 1341 is a poor fit here, as plaintiffs did not directly restore any funds to OPM. However, it appears that certain IRS employees felt that plaintiffs, in effect, were required, in 1997, to restore the $222,739 in payments they had previously received from OPM. Under this view, that restoration was effectuated when the OWC reimbursed OPM for the payments the latter made between 1980 and 1997. For tax purposes, then, plaintiffs could be viewed as having received in 1997 the $222,739 from OWC. But, unlike the receipt of the earlier payments, the latter event had no immediate tax consequences because the amount deemed received from OWC was excludable from gross income under section 104(a) of the Code, as a payment under a worker's compensation act. *See also* Treas. Reg. § 1.104-1(b). This would all fit neatly were it not for other documents in the record which suggest that the IRS determined that plaintiffs were entitled to a refund under the mitigation provisions of section 1311 of the Code. That section, in combination with several accompanying provisions, allows for the correction of the erroneous treatment of an item in a year otherwise closed under the statutes of limitations.[7]   *See* 26 U.S.C. §§ 1312-14 (describing

---

income included under a claim of right means an item included in gross income because it appeared from all the facts available in the year of inclusion that the taxpayer had an unrestricted right to such item, and restoration to another means a restoration resulting because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item (or portion thereof).

[7]   Section 1311(a) provides, in pertinent part, that –

(a) General rule.  If a determination (as defined in section 1313) is described in one or more of the paragraphs of section 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, other than this part and other than section 7122 (relating to compromises), then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314.

26 U.S.C. § 1311(a).  Section 1311(b) lists various conditions necessary for adjustment, among which is the "[m]aintenance of an inconsistent position." *Id*. at § 1311(b).  Section 1312 lists the sorts of determinations that trigger the mitigation provisions, among which is the "[d]ouble inclusion of an item of gross income." *Id*. at 1312(1).  Section 1313(a) defines the term "determination" as including a "final disposition by the Secretary of a claim for refund."

when and how the adjustments in section 1311 are authorized); 2 Mertens Law of Fed. Income Tax'n § 14:01 (2008).  As once described by the Court of Claims, this section, which was originally passed in 1938,[8] "is a relief provision and was enacted to relieve both taxpayers and the Government from the unjust effects, in certain cases, resulting from the correction of errors where the operation of other provisions of the revenue law precludes correction of tax results . . ."  *Gooch Mill & Elevator Co. v. United States*, 78 F. Supp. 94, 97 (1948); *see also United States v. Dalm*, 494 U.S. 596, 610 (1990); *Birchenough v. United States*, 410 F.2d 1247, 1250 (Ct. Cl. 1969).

Sections 1341 and 1311 relax some of the inflexibilities associated with the annual tax accounting system, *see Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 365 (1931), not to mention the limitation provisions in the Code.  Yet, despite this commonality, they operate differently, at least in terms of the years in which the overassessments they generate are reflected.  Under section 1341(a), a taxpayer is permitted to reduce its taxes in the year of repayment by the amount of tax previously paid, with any overpayment to be "refunded or credited in the same manner as if it were an overpayment for such taxable year."  26 U.S.C. § 1341(b); *see also id.* at § 1341(a)(5).  As such, if section 1341 is controlling, any resulting overpayment here would be deemed to have occurred in the year of the restoration, that is, in 1997, with any overpayment deemed to have been made as of the due date for that year's return, that is, April 15, 1998.[9]  The same is not true under section 1311.  The timing of the adjustments made thereunder is controlled by section 1314 of the Code, which, in pertinent part, provides that –

> "[t]he adjustment authorized in section 1311(a) shall be made by . . . refunding or crediting . . . the amount thereof in the same manner as if it were . . . an overpayment claimed by such taxpayer . . . for the taxable year or years with respect to which an amount is ascertained under subsection (a) and as if on the date of the determination one year remained before the expiration of the periods of limitation upon . . . filing claim for refund for such taxable year or years."

*See also* S. Rep. No. 1567, at 52 (describing this provision as enacted as part of the Revenue Act of 1938); H.R. Conf. Rep. 2330, at 57-58 (same).  Indeed, the regulations under this provision make clear that "the amount of an adjustment treated as if it were . . . [an] overpayment . . . will

---

[8]  *See* Revenue Act of 1938, Pub. L. No. 554, § 820, 52 Stat. 447, 581-83; *see also* S. Rep. No. 1567, at 48-49 (1938); H. R. Conf. Rep. No. 2330, at 57-58 (1938).  This provision was initially enacted as the legislative successor to the equitable recoupment doctrine enunciated by the Supreme Court in *Bull v. United States*, 295 U.S. 247 (1935).  The provision began as section 820 of the Revenue Act of 1938, became section 3801 of the Internal Revenue Code of 1939, and, ultimately, assumed its current number as part of the 1954 Code.

[9]  *See Shipley v. United States*, 608 F.2d 770, 773 n.3 (9th Cir. 1979) ("the concept of the statute is to adjust the taxes due in the year of restoration"); *Estate of Smith v. Comm'r of Internal Revenue*, 110 T.C. 12, 17 (1998).

bear interest . . . to the extent provided by the internal revenue laws applicable to . . . overpayments for the taxable years with respect to which the adjustment is made." Treas. Reg. § 1.1314(b)-(1)(c). Accordingly, if the adjustments here were made under section 1311, then, under section 1314(a), the overassessments on which interest would run would be deemed to have occurred in each of the years in which plaintiffs improperly included the payments from OPM into income (*e.g.*, 1980 through 1996), with the overpayments deemed to have arisen on the due dates for those returns (*e.g.*, the succeeding April 15).

So, which provision was the basis for the settlement here? This question raises an interesting possibility not heretofore considered, *to wit*, that while the allowance of interest is not directly founded upon the language of the Form 870-AD, it is, nonetheless, impacted by that language to the extent that it reveals whether the overassessment here was based on section 1311 or 1341. Viewed in this way, the agreement may well not be silent, but rather ambiguous. The form cites neither of the relevant Code sections – if it did, our task would be much easier. While a box in the agreement suggests that the overassessment related to the "Year Ended" "12/31/97," that figure is accompanied by an asterisk that indicates that the cited date refers to the "Claim." The former reference suggests that the overassessment is creditable to 1997, evidence that section 1341 applies; yet, the asterisked reference immediately negates that inference by suggesting that 1997 is merely the year associated with the refund claim. Of course, the other two forms that plaintiffs signed – IRS Forms 2297 and 3363 – contain neither an asterisk nor a reference to a claim date, nor, for that matter, any reference to either section 1311 or 1341, but instead indicate that the claim itself relates to the taxable period ended "12/31/97." Yet, it is difficult to place too much (let alone decisive) weight on these side agreements as they were designed only to waive the statute of limitations as to the proposed disallowance of a small portion of the plaintiffs' refund claim and to procure the plaintiffs' agreement to that disallowance. Moreover, in performing under these agreements, defendant did not issue a single refund check for 1997, but rather issued eleven separate checks to plaintiffs – one for each of the taxable years 1986 through 1996. This course of conduct is inconsistent with the notion that the overassessment occurred solely in 1997, but rather suggests that overassessments arose in most of the years in which plaintiffs reported the payments received from OPM – that is, a result consistent with adjustments made under section 1311 and not section 1341.

But can the court consider this and other extrinsic evidence? Familiar contract construction rules provide that "'the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" *Metric Constrs., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)); *see also TEG-Paradigm Environmental Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). "When the contract's language is unambiguous," the Federal Circuit recently stated, "it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." *TEG-Paradigm*, 465 F.3d at 1338; *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc); *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing numerous cases). However, "when a provision in a contract is susceptible to more than one reasonable

interpretation, it is ambiguous" and, in such an instance, the court "may then resort to extrinsic evidence to resolve the ambiguity." *TEG-Paradigm*, 465 F.3d at 1338; *see also Metric Constrs., Inc.*, 169 F.3d at 752; *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986). Such extrinsic evidence may be employed to "interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself." *TEG-Paradigm*, 465 F.3d at 1339; *see also* Restatement (Second) Contracts § 215 cmt. b (1981); 6-26 Corbin on Contracts § 579 (2006). While there may be some doubt as to the mechanisms for enforcing Forms 870-AD, *see, e.g.*, *Union Pacific R. Co.*, 847 F.2d at 1571, there is none that the foregoing rules apply in construing such forms.[10]

Extrinsic evidence, including defendant's performance under the contract, is admissible here for several reasons. For one thing, the meaning of the Form 870-AD, in regards to which Code provision is operative here, is certainly neither plain nor ordinary, nor even deducible from the face of the agreement. Rather, that agreement, even when considered in conjunction with the other IRS forms at issue, appears to provide conflicting clues as to whether the overassessments here were based upon either section 1311 or 1341.[11] On that basis alone, extrinsic evidence must be considered. In fact, it would be error coupled with irony to preclude the introduction of extrinsic evidence here on the notion that we have a plain, integrated agreement, when there is no direct language dealing with the interest issue and when the various clues on the form become visible only when viewed in the light of several extrinsic Code provisions. *See Blue Cross & Blue Shield United of Wisc. & Subs. v. United States*, 117 Fed. Appx. 89, 93 (Fed. Cir. 2004). Unless he could use the Code as a decrypter, even Mr. Holmes, with all his deductive powers, would neither have deduced the potential significance of the stick-like entries found in the Form 870-AD, nor described those references as being plain, let alone "elementary." Even Holmes, after all, needed some facts – he could not "make bricks without clay."[12] Accordingly, not even the most microscopic reading of the forms in question can escape the conclusion that the

---

[10] *See, e.g.*, *West Pub. Co. Employee's Preferred Stock Ass'n v. United States*, 198 Ct. Cl. 668, 679 (1972); *Goldman v. Comm'r of Internal Revenue*, 39 F.3d 402, 405 (2d Cir. 1994); *Flynn v. United States by and through Eggers*, 786 F.2d 586, 590 (3d Cir. 1986); *Quigley v. Internal Revenue Serv.*, 289 F.2d 878 (D.C. Cir. 1960); *see also United States v. Price*, 361 U.S. 304, 306 (1960); *United States v. National Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996); *Rink v. Comm'r of Internal Revenue*, 47 F.3d 168, 171 (6th Cir. 1995); *Alexander v. United States*, 44 F.3d 328, 332 (5th Cir. 1995).

[11] The issue here is ***not***, as defendant seems to suggest, whether either of these provisions actually applies or is a better fit here. The question, rather, is what the parties agreed, an issue that, as described, involves tax law, but ultimately is controlled by contract principles.

[12] Arthur Conan Doyle, The Complete Sherlock Holmes, The Adventures of Sherlock Holmes, The Adventure of Copper Beeches 322 (Doubleday 1930); *see also United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008) ("Even Sherlock Holmes, living as he does in the pages of fiction where reality is bounded only by imagination, needs some *factual* clues to work his investigative magic.").

agreement in question can be clarified only with the introduction of extrinsic evidence regarding the intentions of the parties, as reflected by their negotiations and by their performance under the agreements.  *See, e.g., Blue Cross & Blue Shield United of Wisc. & Subs. v. United States*, 71 Fed. Cl. 641, 652-62 (2006) (considering various extrinsic evidence in construing an IRS closing agreement).

This same conclusion obtains even if, as defendant contends, the parties never came to any agreement as to how plaintiffs would receive interest on their overassessments here.  It appears that, overall, the parties intended to create a mutually binding obligation that was sufficiently defined to resolve plaintiffs' refund claim (intentions that, indeed, were effectuated through performance).  Nonetheless, it is true that the Form 870-AD can be read as providing no indication as to how interest would be calculated for that refund.  However, such a "failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction."  *Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 399 (2d Cir. 2004). Rather, Restatement (Second) of Contracts, § 204 provides that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."[13]  Such an omission may occur where the parties "have expectations but fail to manifest them."  *Id*. at cmt. b; *see also Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 379 (2006).  In such a circumstance, "the court should supply a term which comports with community standards of fairness and policy."  Rest. (Second) of Contracts, §204, cmt. d; *see also Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 100 (2003); *Howell v. United States*, 51 Fed. Cl. 516, 523 (2002).  "Evidence of prior negotiations . . . is not admissible to supply the omitted term, but such evidence may be admissible, if relevant, on the question of what is reasonable in the circumstances."  Rest. (Second) of Contracts, § 204, at cmt. e. Accordingly, while supplying this term is not so much a form of interpretation as interpolation, it would appear that the same sort of evidence that is relevant to interpreting the agreement is also relevant even if the agreement can be viewed as lacking entirely any reference to the interest owed on the overassessment indicated.

In short, it would appear that, whether the Form 870-AD is viewed as being ambiguous or as wholly missing a term, plaintiffs have the better of the argument in contending that defendant is not entitled to judgment as a matter of law because additional evidence must be considered to resolve genuine issues of material fact.  *See Jones Boat Yard, Inc. v. M/V Capella C*, 2006 WL 3664405, at *6-7 (S.D. Fla. 2006).

---

[13]  *See David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977) ("[T]he task of supplying a missing, but essential term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court."); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003); *see also Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 236 (4th Cir. 2006).

III.     CONCLUSION

"*The Case of the Cryptic Code*" – the last two words of this title are revealed to be a double *entendre* that refers not only to the ciphers found on the Form 870-AD, but to *the* Code – the Internal Revenue Code – which provided the framework for the agreement.  Wisdom and legal necessity require that the role played by both codes be more fully explored, so that the court may move from suspicions to proofs.  Based on the foregoing, the court **DENIES** defendant's motion for summary judgment.  On or before April 29, 2008, the parties shall file a joint status report indicating how this case should proceed, which report shall consider the possibility that further discovery is needed here.  Before that report is filed, the parties shall have at least one serious discussion regarding settlement.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

-15-