# In The United States Court of Federal Claims

No. 06-383T

(Filed:  March 19, 2010)
_____

| | |
|---|---|
| HARRY G. SCHORTMANN, JR., and JACQUELINE SCHORTMANN, | * Contract action; Trial; Interest deriving from |
| | * an overpayment; Contract missing essential |
| | * term; Restatement (Second) Contracts § 204 |
| Plaintiffs, | * – term reasonable in the circumstances |
| | * supplied by the court; Determination of |
| v. | * reasonable term for interest; Interest paid by |
| | * Internal Revenue Service complied with |
| THE UNITED STATES, | * reasonable term; No breach of settlement |
| | * agreement. |
| Defendant. | * |

_____

## OPINION
_____

*Brian C. McManus*, with whom were *Miriam Fisher* and *Joshua Wu*, Morgan, Lewis & Bockius, LLP, Washington, D.C., for plaintiffs.

*Jacob E. Christensen*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John A. DiCicco*, for defendant.

**ALLEGRA, Judge**:

"*To every complicated problem there is a simple solution, which turns out to be wrong.*"[1]

Various temporal limitations are interwoven into the Federal income tax system.  The warp of that system is the annual accounting principle, famously described in *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 365 (1931), which vertically limits the calculation of income to events occurring within a given taxable year.  Then, there are the wefts supplied by the limitation provisions in the Internal Revenue Code (26 U.S.C.), which introduce into the weave finality principles that horizontally limit, to a prescribed set of years, the ability of taxpayers and government alike to modify the computation of income.  Meshed together, these concepts form a tough fabric that resists efforts to reach back and remedy even the most patent of errors.  The necessity for this resistance makes sense in the broader state of affairs, based, *inter alia*, on the paramount need "to produce revenue ascertainable and payable at regular intervals," *Hillsboro Nat'l Bank v. Comm'r of Internal*

[1] H.L. Mencken (attributed).

*Revenue*, 460 U.S. 370, 377 (1983).  Yet, as attractive as this rationale might be from a tax policy perspective, it offers little solace to the individual taxpayer who finds himself on the wrong side of these limitations.  Often he or she perceives the warp and wefts not as a cohesive body of law, but as an entangling web of inequity – and sometimes that perception is reality.

In a very few situations, the Code offers such taxpayers a glimmer of hope in the form of provisions that can carve across these temporal limitations.  Yet, these provisions are very limited in scope lest they serve too much to undercut the norm.  In the case at hand, the Internal Revenue Service (IRS) invoked, alternatively and in combination, two of these sections – the mitigation provision and the so-called "claim of right" doctrine found in sections 1311 and 1341 of the Code, respectively.  However, the plaintiffs, Harry Schortmann, Jr. and his wife, Jacqueline, contend that the IRS' efforts did not go far enough – that the agency, in particular, breached a settlement agreement entered into by the parties to resolve a refund claim when it failed to pay plaintiffs all the interest to which they were entitled.  Based upon the evidence presented by the parties at a trial in Boston, Massachusetts, and for the reasons that follow, the court finds otherwise, holding that the Schortmanns have recouped all to which they are entitled under their agreement with the IRS – and are owed nothing more.

## I.     FINDINGS OF FACT

Based upon the record, including the parties' stipulation of facts, the court finds as follows:

In 1978, Mr. Schortmann retired from his job as an air traffic controller due to a debilitating illness.  Over the next twenty years, he received retirement benefits from the Office of Personnel Management (OPM).  Each year, he and his wife reported those payments as income on their Federal income tax return and paid the tax thereon.  In 1997, however, the Office of Workers' Compensation (OWC) determined that Mr. Schortmann should have received disability payments from his retirement in 1978 through 1997, payments that were not taxable under section 104(a) of the Code.[2] OWC repaid OPM a total of $222,739 that the latter agency had paid to Mr. Schortmann and assumed the obligation to make further disability payments to him.  On their 1997 income tax return, plaintiffs claimed a refund of $36,772.60 for the taxes they paid on the benefits from 1980 through 1996.  To the right of this entry, they typed "I.R.C. 1341," an apparent reference to section 1341, which, as mentioned above, deals with the computation of tax where a taxpayer restores certain amounts previously held under a so-called "claim of right."  *See* 26 U.S.C. § 1341.

On March 2, 1998, the IRS issued a refund to plaintiffs of $594.21 for their 1997 tax year, which refund did not include the amounts claimed under section 1341.  On March 17, 1998, Mr. Schortmann wrote the IRS objecting to the refund and claiming that he was entitled to the full amount requested on plaintiffs' 1997 return.  The IRS treated this letter as a claim for refund and, on

---

[2] Section 104(a) excludes from gross income, and thereby from federal income taxation, various amounts received as compensation for personal injuries or sickness.  26 U.S.C. § 104(a).

August 11, 1998, notified plaintiffs that their claim had been denied.  On August 17, 1998, plaintiffs appealed this rejection to the IRS New England Appeals Office in Boston, Massachusetts.  The case was assigned to IRS appeals officer Eleanor J. McCarthy.

In 1999, the IRS Appeals Office determined that plaintiffs were entitled to an overpayment of tax in the amount of $36,165.00 (the slight difference between this figure and the $36,772.60 claimed is immaterial).  On April 20, 1999, plaintiffs executed a settlement agreement with the Appeals Office, embodied in a Form 870-AD.  Stock language in that form stated –

> Under the provisions of section 6213(d) of the Internal Revenue Code of 1986 (the Code), or corresponding provisions of prior internal revenue laws, the undersigned offers to waive the restrictions provided in section 6213(a) of the Code or corresponding provisions of prior internal revenue laws, and to consent to the assessment and collection of the following deficiencies and additions to tax, if any, with interest as provided by law.  The undersigned offers also to accept the following overassessments, if any, as correct.  Any waiver or acceptance of an overassessment is subject to any terms and conditions stated below and on the reverse side of this form.

Also recorded in the form was the following –

| Deficiencies (Overassessments) and Additions to Tax | | | | | | |
|---|---|---|---|---|---|---|
| Year Ended | Kind of Tax | Tax | | | | |
| 12/31/97* | Income | $(36,165) | $ | $ | | |
| (Claim)* | | | | | | |

The form referenced neither an explicit amount of interest to be paid on the overassessment indicated, nor any method for calculating that interest.  Plaintiffs also executed IRS Forms 3363 (Acceptance of Proposed Disallowance of Claim for Refund or Credit) and 2297 (Waiver of Statutory Notification of Claim Disallowance), both reflecting that $608 of their claimed refund had been "disallowed."

On May 27, 1999, the IRS notified plaintiffs that it was completing the processing of the settlement.  The letter indicated that "[w]e will adjust your account and figure the interest," adding that "[i]f you are due a refund, the Service Center will send it within 60 days from the date of this letter."  Some time thereafter (most likely on or near August 4, 1999), the IRS finalized an "Appeals Transmittal and Case Memorandum," reflecting the allowance of the following refunds for the tax periods indicated:

| Tax Period | Allowed Amount |
|------------|----------------|
| 1996 | $2,252.00 |
| 1995 | $2,066.00 |
| 1994 | $1,954.00 |
| 1993 | $1,744.00 |
| 1992 | $  856.00 |
| 1991 | $4,470.00 |

| Tax Period | Allowed Amount |
|------------|----------------|
| 1990 | $6,143.00 |
| 1989 | $2,465.00 |
| 1988 | $3,805.00 |
| 1987 | $8,843.00 |
| 1986 | $1,567.00 |
|  |  |

These numbers were generated after IRS personnel could not process the settlement as a refund solely for 1997. The IRS calculated these dollar amounts by determining the amount of nonrefunded tax that plaintiffs had paid for each year prior to 1997, and subtracting (abating) that amount sequentially from the $36,165 recovery until that figure was exhausted.[3]

Meanwhile, on July 14, 1999, Gerald McMahon, Chief of the IRS New England Appeals Office, signed a memorandum, entitled "Schortmann, H&J – 1997 (Claim), Barred YRS: 1995 thru 1986 – Section 1311." This memorandum stated as follows:

At Appeals, this case was settled in accordance with Section 1.1341-1(a)(2) of the Regulations. Section 1341 alleviates the inequity caused by timing differences.

Assessments, refunds and credits which otherwise would be barred by the statute of limitations or other rules of law may be allowed to correct specified errors under the mitigation provision of Code Section 1311. Therefore, in accordance with Section 1311, the taxpayers will be allowed refunds as outlined in Appeals transmittal for tax years 1995 thru 1986. (1996 yr also included but not barred).

An IRS routing sheet tacked to this memorandum, likewise dated July 14, 1999, and signed by Ms. McCarthy, reflects that "[p]er discussion with Chief, Appeals . . . it was agreed that interest would be refunded on the following years from the due date of the return: 1996, 1995, 1994, 1993, 1992, 1991. The remaining years 1990, 1989, 1988[,] 1987 and 1986 will have no interest refunded." Completing the same package was an "Appeals Case Memorandum," which stated that the settlement was under section 1341(a) of the Code. The memorandum also found that "[e]quity requires that the taxpayer be allowed to reduce his tax in the restoration year by the amount paid on

---

[3] For example, the IRS determined that plaintiffs had paid $2,252 in tax for 1996 that had not been refunded. It thus scheduled a refund for that year corresponding to that amount, leaving $33,913 still to be refunded ($36,165 - $2,252). The $33,913 was carried back to 1995, in which the plaintiff had paid $2,066 in tax; that amount was refunded and $31,847 ($33,913 - $2,066) was carried back to 1994, and so on.

the restored income in the year of inclusion because, had the absence of a right to the income been known, the item would not have been included and no tax would have been due."[4]

---

[4] At trial, Ms. McCarthy further enlightened the court as to her approach as follows:

Q:     [H]aven't you also testified that the basis for your settlement was equitable?

A:     Yes.

*       *       *       *       *

Q:     When you settled this case were you also thinking about the mitigation doctrine?

A:     Yes.

*       *       *       *       *

Q:     But in this case, Mr. Schortmann only paid $5.79?

A:     And that's the reason why it wasn't done that way. That's why I went back under the mitigation, and I settled the case as an appeals officer. And I just wanted to be reasonable on the case, and I went back and I thought it was a reasonable settlement in appeals . . . .

Q:     So in this particular case, how did you figure out how you were going to get him more than $5 –

A:     I couldn't do anything for that year [1997]. I went back to the other years . . . retrieved the money for the other years and gave him the refund back, but they were all barred by statute.

Q:     So you opened up those other years, in effect?

A:     Yes.

Q:     And so it's your understanding that you were actually refunding the tax for those other particular years, for example, 1995, 1994, 1993; you were actually giving him refunds out of those tax years; is that correct?

A:     Yes, and I believe that's how Mr. Schortmann came out with the total on the bottom if you look at the exhibit here on . . . . [t]hat's how Mr. Schortmann came up with them.

From August to November of 1999, the IRS issued eleven separate checks to plaintiffs, in three batches, each check corresponding to one of plaintiffs' taxable years 1986 through 1996, respectively.  In total, the IRS refunded plaintiffs $36,165 in tax, as well as $6,534.36 in interest.[5]

Plaintiffs felt that the award of interest was insufficient.  On June 28, 2006, they filed a complaint in this court seeking unpaid interest owed under the aforementioned settlement agreement, as well as compensatory and punitive damages and attorney's fees and costs.  On August 28, 2006, defendant answered plaintiffs' complaint and filed a partial motion to dismiss.  On December 8, 2006, plaintiffs filed a motion to transfer their complaint to the United States District Court for the District of Massachusetts.  Defendant opposed the latter motion.  On January 12, 2007, the court

---

\*       \*       \*       \*       \*

Q:     And the reason for that is because you did not restore it to 1997?

A:     Yes, because we couldn't.

Q:     So you actually went back and made refunds for all those prior years; is that correct?

A:     Right, correct.

[5]  The following chart shows the breakdown between refund and interest:

| Year | Total payment issued to plaintiff by IRS | Refund paid (abating taxes paid) | Interest paid |
|---|---|---|---|
| 1996 | $2,690.86 | $2,252.00 | $438.86 |
| 1995 | $2,667.64 | $2,066.00 | $601.64 |
| 1994 | $2,738.13 | $1,954.00 | $784.13 |
| 1993 | $2,662.72 | $1,744.00 | $918.72 |
| 1992 | $1,387.74 | $856.00 | $531.74 |
| 1991 | $7,729.27 | $4,470.00 | $3,259.27 |
| 1990 | $6,143.00 | $6,143.00 | $0.00 |
| 1989 | $2,465.00 | $2,465.00 | $0.00 |
| 1988 | $3,805.00 | $3,805.00 | $0.00 |
| 1987 | $8,843.00 | $8,843.00 | $0.00 |
| 1986 | $1,567.00 | $1,567.00 | $0.00 |
| **TOTAL** | **$42,699.38** | **$36,165.00** | **$6,534.36** |

dismissed the portions of plaintiffs' complaint that requested relief unavailable in this court (*e.g.*, punitive damages) and denied plaintiffs' motion to transfer the case, finding that it has exclusive jurisdiction over this matter.

On February 21, 2007, defendant filed a motion for summary judgment, asserting that plaintiffs had received all the interest they were owed.[6]  Thereafter, the firm of Morgan, Lewis and Bockius agreed to represent plaintiffs, *pro bono*.  After briefing and argument, the court denied defendant's motion, concluding that sovereign immunity principles did not preclude the recovery of interest and that factual questions underlying the interpretation of the agreement in question needed to be resolved.  *Schortmann v. United States*, 82 Fed. Cl. 1 (2008).  In this opinion, the court contrasted the claim of right provisions of 26 U.S.C. § 1341 and the mitigation provisions of 26 U.S.C. §§ 1311-14, as they might apply to this case, thusly –

> Sections 1341 and 1311 relax some of the inflexibilities associated with the annual tax accounting system, . . . , not to mention the limitation provisions in the Code. Yet, despite this commonality, they operate differently, at least in terms of the years in which the overassessments they generate are reflected.  Under section 1341(a), a taxpayer is permitted to reduce its taxes in the year of repayment by the amount of tax previously paid, with any overpayment to be "refunded or credited in the same manner as if it were an overpayment for such taxable year."  26 U.S.C. § 1341(b); *see also id.* at § 1341(a)(5).  As such, if section 1341 is controlling, any resulting overpayment here would be deemed to have occurred in the year of the restoration, that is, in 1997, with any overpayment deemed to have been made as of the due date for that year's return, that is, April 15, 1998.  The same is not true under section 1311.  The timing of the adjustments made thereunder is controlled by section 1314 of the Code, which, in pertinent part, provides that –

>> "[t]he adjustment authorized in section 1311(a) shall be made by . . . refunding or crediting . . . the amount thereof in the same manner as if it were . . . an overpayment claimed by such taxpayer . . . for the taxable year or years with respect to which an amount is ascertained under subsection (a) and as if on the date of the determination one year remained before the expiration of the periods of limitation upon . . . filing claim for refund for such taxable year or years."

> Indeed, the regulations under this provision make clear that "the amount of an adjustment treated as if it were . . . [an] overpayment . . . will bear interest . . . to the extent provided by the internal revenue laws applicable to . . . overpayments for the taxable years with respect to which the adjustment is made."  Treas. Reg.

---

[6]  While defendant asserts that plaintiffs received approximately $2,400 more in interest than to which they were entitled, it has not pursued a counterclaim.

§ 1.1314(b)-(1)(c).  Accordingly, if the adjustments here were made under section 1311, then, under section 1314(a), the overassessments on which interest would run would be deemed to have occurred in each of the years in which plaintiffs improperly included the payments from OPM into income (*e.g.*, 1980 through 1996), with the overpayments deemed to have arisen on the due dates for those returns (*e.g.*, the succeeding April 15).

*Schortmann*, 82 Fed. Cl. at 9 (citations and footnote omitted).  The court held that questions of fact existed as to what the parties intended with respect to the application of these provisions, noting that "not even the most microscopic reading of the forms in question can escape the conclusion that the agreement in question can be clarified only with the introduction of extrinsic evidence regarding the intentions of the parties, as reflected by their negotiations and by their performance under the agreements."  *Id.* at 11.  "The same conclusion obtains," the court found, "even if, as defendant contends, the parties never came to any agreement as to how plaintiffs would receive interest on their overassessments here."  *Id.*  Finding the case unsuitable for summary resolution, the court set it down for trial.

That trial took place on April 29-30, 2009.  Five witnesses testified:  Mr. Schortmann; Ms. McCarthy; Gerald McMahon, Chief of the IRS New England Appeals Office; Murray Sachs, the Acting Associate Chief for the same office at the time of the settlement; and Mariline Cosme-Newman, the agent at the closing unit of the same office, who processed plaintiffs' claim following the execution of the Form 870-AD.

At trial, Mr. Schortmann reaffirmed his belief that, under the settlement, he was to receive tax refunds, with interest, for each taxable year from 1980 through 1996.  He testified that during settlement discussions, he and Ms. McCarthy "went through each year from 1980 through 1996," establishing "what the [requested refund] amounts were."  Relying on his notes of their conversations, Mr. Schortmann indicated that he believed that the "income tax was going to be refunded according" to the following table:

| Year | Filed Taxable Income | Disability Pension Repayment | Taxable Income after Pension Repayment | Income Tax on Filed Income | Income Tax after Pension Repayment | Income Tax Credit |
|------|---------------------|------------------------------|----------------------------------------|----------------------------|-------------------------------------|-------------------|
| 1980 | $26,035.53 | $8,152.13 | $17,883.40 | $3,713.53 | $1,819.00 | $1,894.53 |
| 1981 | $19,076.34 | $9,189.00 | $9,887.34 | $2,965.00 | $1,027.00 | $1,938.00 |
| 1982 | $16,626.54 | $9,891.00 | $6,735.54 | $2,151.00 | $424.00 | $1,727.00 |
| 1983 | $20,158.91 | $10,348.00 | $9,810.91 | $2,639.00 | $838.00 | $1,801.00 |
| 1984 | $17,562.62 | $10,476.00 | $7,086.62 | $2,025.00 | $420.00 | $1,605.00 |
| 1985 | $30,197.12 | $10,836.00 | $19,361.12 | $4,733.53 | $2,302.00 | $2,431.53 |
| 1986 | $44,741.53 | $10,836.00 | $33,905.53 | $10,728.54 | $5,633.00 | $5,095.54 |

| 1987 | $45,319.33 | $10,968.00 | $34,351.33 | $8,954.00 | $5,865.00 | $3,089.00 |
|---|---|---|---|---|---|---|
| 1988 | $25,603.89 | $11,424.00 | $14,179.89 | $3,844.00 | $2,126.00 | $1,718.00 |
| 1989 | $16,658.01 | $11,880.00 | $4,778.01 | $2,501.00 | $716.00 | $1,785.00 |
| 1990 | $37,205.40 | $12,432.00 | $24,773.40 | $6,205.00 | $3,716.00 | $2,489.00 |
| 1991 | $30,235.64 | $13,092.00 | $17,143.64 | $4,534.00 | $2,569.00 | $1,965.00 |
| 1992 | $5,999.66 | $13,572.00 | ($7,572.34) | $896.00 | $0.00 | $896.00 |
| 1993 | $11,623.53 | $13,968.00 | ($2,344.47) | $1,744.00 | $0.00 | $1,744.00 |
| 1994 | $13,022.24 | $14,238.00 | ($1,215.76) | $1,954.00 | $0.00 | $1,954.00 |
| 1995 | $14,086.21 | $14,625.00 | ($538.79) | $2,111.00 | $0.00 | $2,111.00 |
| 1996 | $16,817.00 | $15,003.00 | $1,814.00 | $2,801.00 | $272.00 | $2,529.00 |
| **Total** | | | | | | **$36,772.60** |

As this chart reveals, Mr. Schortmann, unlike the IRS, calculated the amount of the refunds by deducting from his income each year the amount of his pension repayment and then determining the resulting difference in tax.[7]  Further commenting on this table, Mr. Schortmann testified that although "[t]here were a couple of years, I think 1985 or 1986, that [Ms. McCarthy] felt I didn't figure my tax right because of income tax averaging . . . [o]ther than that, we went through every single year, and we agreed on everything other than those adjustments that she was going to make."[8]

While, at trial, Mr. Schortmann reaffirmed his belief that Ms. McCarthy had agreed to provide interest on his refunds for each year, from 1980 through 1996, other aspects of his testimony suggest that his conversations with Ms. McCarthy lacked specificity, giving rise to the specter of a misunderstanding.  Thus, on the one hand, Mr. Schortmann claimed that he and Ms. McCarthy had gone over each of the years affected and had agreed that he "was going to get interest for all these years."  But, on the other hand, when questioned by the court about whether Ms. McCarthy had agreed to any specific timing for the interest, Mr. Schortmann responded, "[w]e discussed the interest.  I know what I thought, but I'm not so sure that I knew what – what she was – what she had

_____

[7]  While both plaintiffs' and the IRS' approach to calculating the refunds generated a series of payments over a number of years, the methodologies employed were quite different.  While plaintiffs operated on the assumption that they would receive refunds corresponding to the amount of tax they had paid on the reported income in any given year, the IRS was prepared to refund plaintiffs only the amount of a tax paid for a given year that had not been refunded.

[8]  Until repealed in 1986, income averaging was a method of calculating tax liability by reference to the taxpayer's average income over the four preceding years.  *See* 26 U.S.C. §§ 1301-05 (1982).  It was "designed to reduce the tax burden where a person ha[d] a big increase in income."  Boris I. Bittker, Lawrence M. Stone, William A. Klein, Federal Income Taxation 404-05 (6th ed. 1984).

in her mind as far as starting and stopping dates, because I don't think we discussed that." Mr. Schortmann also readily acknowledged that he and Ms. McCarthy had never discussed a specific amount of interest because "Ms. McCarthy said . . . it was too difficult to compute," adding that he assumed that the calculations would be made for each year according to "standard IRS procedure."

Ms. McCarthy's memory of these conversations confirms that the parties never really discussed, with any specificity, how interest would be computed. She readily allowed that, during settlement discussions, Mr. Schortmann was "very adamant [that] he wanted all the money back plus interest for all the years." But, she testified that, at the time of the negotiations, she believed that, under applicable law, plaintiffs were only entitled to a tax refund in 1997, the year of their claim, and "would have only received the interest for one year . . . like $1,500." She noted that because plaintiffs' 1997 tax liability was only $5.79, their tax refund, under a strict application of section 1341 of the Code, would have been limited to that amount. But, desirous of a more equitable solution, Ms. McCarthy testified that she "went back to the other [tax] years" which were "barred by statute" and opened them up, abating plaintiffs' tax liability for prior years until the full amount of tax had been refunded.[9] Then there was the matter of interest. As to that, Ms. McCarthy testified that she decided plaintiffs should receive interest on half of the years abated, a solution she believed to be "reasonable for the government and reasonable for the taxpayer to settle the case." In her words: "I had given him all the taxes back he paid and then I just felt, you know . . . give him the interest for half of them."[10] She recalled "explaining to Mr. Schortmann" before he and his wife signed the Form 870-AD settlement agreement "that [she] was going to refund him interest for a certain number of years but not for other years." When asked about Mr. Schortmann's response to this, Ms. McCarthy testified, "If I recall, I don't think he was too happy with it . . . [and] he may have said, 'I'll think it over.'" However, when asked, "Do you specifically remember Mr. Schortmann telling you that he agreed to your method of paying him interest on certain years but not on other years?" Ms. McCarthy responded, "I don't remember. I don't recall."

Following post-trial briefing, closing argument was held on October 26, 2009.

_____

[9] Ms. Cosme-Newman's testimony corroborated Ms. McCarthy's explanation of how plaintiffs' claim was processed. Ms. Cosme-Newman stated that she could not have processed plaintiffs' tax refund from the 1997 tax year alone because of the limited tax paid in that year. As she explained it, "it is impossible to abate something that does not exist." She testified that, in order to effectuate the full tax refund, she would have followed the appeals transmittal she received from Ms. McCarthy, which attached a breakdown of plaintiffs' refund abating their tax liability over a period of 10 years, from 1996 through 1986. She stated that she could have accessed the statutorily closed tax years through use of a manually-issued refund, explaining that "[e]ven though they are barred, the system will actually allow me to make the abatements."

[10] In a later letter to Mr. Schortmann dated February 17, 2000, Ms. McCarthy explained the rationale for her decision in terms of the statute of limitations, suggesting that she had previously advised Mr. Schortmann that he "would receive interest for the open years only."

## II.    DISCUSSION

What this court has said before, still holds true – "[t]his case presents an interesting interplay between tax and contract law, with the ultimate resolution herein lying at the end of a labyrinthine path through the mean streets and back alleys of these two complex subjects." *Schortmann*, 82 Fed. Cl. at 4. Quite naturally, the initial focus here was on the Form 870-AD signed by the parties. But, upon close examination, this form was found wanting – at least in the sense that it did not contain any terms concerning what interest, if any, was owed on the refund(s) in question. The parole evidence introduced at trial – offering not only an oral and written history of the parties' negotiations, but also a snapshot of the activity undertaken to process the agreement – did not alter this view. Rather, that evidence demonstrated that the result reached by the parties in their agreement was not, as the court had previously suspected, dictated by any particular provision of the Code.

The testimony and associated documents suggest that the parties had two very different concepts of what interest was owed – views that were never reconciled. Plaintiffs envisioned the settlement as producing a series of refunds, dating back to 1980, with interest owed for each of the years involved. For her part, however, Ms. McCarthy, the IRS appeals officer with whom Mr. Schortmann worked, initially believed that plaintiffs were entitled to a single refund for 1997, with interest owed only from that year. When the IRS' processing unit could not effectuate this refund – because the amount of the refund well-exceeded the tax paid by plaintiffs in 1997 – the IRS came up with a novel idea, that is, to refund plaintiffs the tax they had overpaid by going back and processing refunds, year-by-year, until the amount of the total refund was exhausted. The latter approach yielded, to be sure, a series of checks, dating back not to 1980, but only to 1986, the year in which the 1997 refund was finally paid off. While the series of refund checks issued by the IRS made it appear as if the agency had adopted plaintiffs' view of the world – at least, in part – that was not the case. Both parties, to be sure, agreed that plaintiffs were entitled to whatever interest was required "by law." But, they retained very different views as to what those requirements were.

The problem here, then, is neither one of interpreting the Form 870-AD as written, nor of implying some oral or written supplemental agreement. It is, rather, that no agreement regarding interest was ever made. So what then?

A "failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction." *Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 399 (2d Cir. 2004); *see also Jay Cashman, Inc. v. United States*, 88 Fed. Cl. 297, 307 (2009). Rather, Restatement (Second) of Contracts, § 204 provides that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *See also Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 236 (4th Cir.), *cert. denied*, 549 U.S. 975 (2006). Section 204, in short, thus "justifies a reasonable substitute for the omitted term." *Pacific Gas and Elec. Co. v. United States*, 536 F.3d 1282, 1289 (Fed. Cir. 2008). A variety of cases in this circuit have endorsed the use of this *casus omissus* rule in contract cases involving the United States.

*See, e.g., id.; David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977); *Jay Cashman*, 88 Fed. Cl. at 307-08; *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003). And this rule has been applied in at least one case involving a Federal agency, where an interest rate was not specified in a contract. *See FDIC v. Rogers Park I*, 1990 WL 482141, at *1 (W.D. Okla. Apr. 11, 1990). Based on these precedents, the court believes this rule applies here. It finds that the parties' bargain was sufficiently defined to be a contract, as evidenced by the performance thereunder, but that the parties failed to agree on an essential term – in this instance, the amount of the interest owed. *See Schortmann*, 82 Fed. Cl. at 7.[11]

It is slightly less clear how to supply that missing term – a critical issue, of course, in determining whether there was a breach here. The cases diverge somewhat in the way they seek to fill such gaps. Some suggest that the court ought to consider evidence of "what terms the parties would have agreed to if the questions had been brought to their attention." *In re Hilling Lumber Co.*, 355 B.R. 566, 573 (Bankr. N.D. W. Va. 2006); *see also Didion Milling, Inc. v. Agro Distribution, LLC*, 2007 WL 702808, at *4-5 (E.D. Wis. Mar. 2, 2007). But, resolving the reasonableness inquiry by reference to the parties' intentions seems misguided, particularly, since the issue is not one of interpretation, and, especially, where, as here, there is reason to believe that the parties might not have easily reached accord on the critical point.[12] Recognizing this, the comments to the Restatement take a more normative approach –

> Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had

---

[11] Traditionally, the distinction between a contract with a missing term and one that is void for indefiniteness was a fuzzy one, indeed. But, the modern trend, as evidenced not only by the Restatement, but also by the Uniform Commercial Code, is less rigid, and finds an enforceable agreement where the parties intended to make a contract. *See* U.C.C. § 2-204(3) (2009) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."). Of course, even under the traditional rule, courts enforced contracts with open or missing terms where there was partial performance at the time of an alleged breach. *See, e.g., United States of America, for the use of Argyle Cut Stone, Co. v. Paschen Contractors, Inc.*, 664 F. Supp. 298, 302 (N.D. Ill. 1987); *see also* Nellie Eunsoo Choi, "Contracts with Open or Missing Terms Under the Uniform Commercial Code and the Common Law: A Proposal for Unification," 103 Colum. L. Rev. 50, 50-51 (2003).

[12] *See Barnes v. Gorman*, 536 U.S. 181, 188 (2002) ("reasonably implied contractual terms are simply those that comport with community standards") (internal quotation marks and citation omitted); *Disotell v. Stiltner*, 100 P.3d 890, 896 (Alaska 2004); *President and Fellows of Harv. College v. PECO Energy Co.*, 787 N.E.2d 595, 601 (Mass. App. Ct. 2003); Restatement (Second) of Contracts § 204 cmt. c (finding the interpretational rules in § 200 inapplicable in this instance); 11 Richard A. Lord, Williston on Contracts § 31:6 (4th ed. 1999).

been raised may be factors in determining what term is reasonable in the circumstances.  But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.

Restatement (Second) of Contracts § 204 cmt. d; *see also Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 100 (2003); *Howell v. United States*, 51 Fed. Cl. 516, 523 (2002); Eyal Zamir, "The Inverted Hierarchy of Contract Interpretation and Supplementation," 97 Colum. L. Rev. 1710, 1718 (1997) (hereinafter "Zamir").[13]  Following this guidance, most cases applying the Restatement rule have abjured efforts to create a hypothetical bargain among the parties as to the missing term, in favor of determining what is reasonable by reference to relevant standards of fairness and equity, including those supplied by usage and custom.[14]  Under this approach, parole evidence regarding the parties' negotiations is not directly relevant, but may shed light on what is customary and, hence,

-----

[13]  By way of further distinguishing situations where there is tacit agreement as to a term, comment c to section 204 provides –

> Where there is tacit agreement or a common tacit assumption or where a term can be supplied by logical deduction from agreed terms and the circumstances, interpretation may be enough.  But interpretation may result in the conclusion that there was in fact no agreement on a particular point, and that conclusion should be accepted even though the omitted term could be supplied by giving agreed language a meaning different from the meaning or meanings given it by the parties.

*See also id*. at § 201 cmt. d.

[14]  *See Bank of New York v. Janowick*, 470 F.3d 264, 272 (6th Cir. 2006), *cert. denied*, 552 U.S. 825 (2007) (focusing on community standards in terms of the allocation of risks and benefits under the contract); *Patten*, 441 F.3d at 236 (relying on state statute to fill in a gap in an agreement); *Family Snacks of N.C., Inc. v. Prepared Prods. Co.*, 295 F.3d 864, 869 (8th Cir. 2002) (looking to Missouri law for guidance); *Baber v. First Republic Group, LLC*, 2008 WL 2356868, at *12 (N.D. Iowa June 6, 2008) (looking to rules of the National Association of Securities Dealers for guidance). One prominent commentator has noted that where there is a gap in a contract, it "cannot be filled, the adjustment cannot be governed, by the promise principle."  Charles Fried, Contract as Promise 69 (1981).  Rather, "some standard of sharing *external* to the intention of the parties must control," a sharing principle that derives from the notion that, in contracting, the parties are "joined in a common enterprise" and thereby "constrained by norms of fairness and honesty."  *Id*. at 72-73 (emphasis in original); *see also* 5 Margaret N. Kniffin, Corbin on Contracts § 24.14 (revised ed. 1998); Zamir, *supra* at 1718-19 ("The 'community standards of fairness and policy,' according to which the court should supply an omitted term, connote moral and social values of fairness, equity, decency, trust, taking the other party's interests into consideration, mutual cooperation, and good faith.").

reasonable.  *See* Restatement (Second) § 204 cmt. e; *see also Schortmann*, 82 Fed. Cl. at 11;
*President and Fellows of Harv. College*, 787 N.E.2d at 601.[15]

      Now, one can argue that, under the Restatement's approach, the missing interest provision
ought simply be supplied by that preeminent source of custom and usage in the federal income tax
arena – the Internal Revenue Code.  Under this scenario, the Form 870-AD would control the
resolution of the substantive tax issue here, while provisions like sections 6611 and 6621 of the Code
would control the interest calculation.  This approach is both straightforward – and wrong.  For one
thing, it ignores that the agreement struck in the Form 870-AD represented a compromise of
plaintiffs' claim that did not, strictly speaking, hew to any single interpretation of the Code.  Indeed,
in resolving and then processing plaintiffs' claim, the IRS neither treated this case solely as involving
a claim of right nor as governed by the mitigation provisions, but instead employed a hybrid
approach, producing what it described as an "equitable" result.  And it is that hybrid approach, rather
than any particular provision in the Code, that drove the determination of the years in which the
particular refunds in question arose.  As the individual refunds in question owe their origin to this
amalgamated approach, it makes little sense to revert to a strict, mechanical application of the Code
in determining the interest owed thereon.

      This is not to say that the Code holds no sway in this analysis.  After all, as this court has
held, it is section 6611 of the Code which waives the sovereign immunity of the United States to
authorize the allowance of interest here.  *See Schortmann*, 82 Fed. Cl. at 6-7.  Moreover, given that
the agreement here settled a tax dispute, not to mention the correlative authority conferred on the
Office of Appeals by provisions such as section 7122 of the Code,[16] it would seem odd to wall off the
determination of what is a reasonable provision of interest from the Internal Revenue Code.  *See*
Internal Revenue Manual § 8.17.6.1 (Nov. 6, 2007) (indicating that payment of interest is mandatory
on overpayments unless specifically prohibited by law or mutual agreement).  The question, rather, is
how to much weight to give the Code in deriving the missing term.  And the cases suggest that the
court should refer to the Code for general guidance, much in the way that other courts dealing with
contracts for goods or services have looked generally to the Uniform Commercial Code or state laws

---

[15]  Plaintiffs cite various cases and Restatement provisions for the proposition that the court
should select a term that operates against the Internal Revenue Service, as the drafter of the 870-AD.
But these *contra proferentem* cases, and other like provisions cited by plaintiffs, involve ambiguous
contracts, not ones in which an essential term is missing.  *See, e.g., Gardiner, Kamya & Assocs.,
P.C. v. Jackson*, 467 F.3d 1348, 1352-53 (Fed. Cir. 2006).  Such cases thus are inapposite.  *See
Zamir*, *supra* at 1720-25 (distinguishing between these interpretational rules and those governing
supplementation).

[16]  The Internal Revenue Manual provides, in relevant part:  "The Appeals mission is to
resolve tax controversies, without litigation, on a basis which is fair and impartial to both the
Government and the taxpayer and in a manner that will enhance voluntary compliance and public
confidence in the integrity and efficiency of the Service."  Internal Revenue Manual § 8.1.1.1 (Oct.
23, 2007).

as indicia of what is a reasonable term. *See Patten*, 441 F.3d at 236; *Family Snacks of N.C., Inc.*, 295 F.3d at 869; *Nat'l Audubon Soc'y, Inc. v. Watt*, 678 F.2d 299, 310-11 (D.C. Cir. 1982) (supplying a missing term by "reference to the Secretary's discretionary power under [the National Environmental Policy Act]").

Plaintiffs assert that the calculation of interest is a simple matter of applying section 6611 to the "overpayments" triggered by the parties' agreement, thereby affording plaintiffs interest for their tax years 1980 through 1996. *See also* Treas. Reg. § 1.1314(b)-(1)(c). The problem, however, is that this approach assumes too much. As a threshold matter, it takes for granted that "overpayments" were generated annually for each year in which plaintiffs recognized income that should have been excluded from taxation under section 104 of the Code. However, for purposes of section 6611, the Supreme Court has "read the word 'overpayment' in its usual sense, as meaning any payment in excess of that which is properly due." *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531 (1947); *see also United States v. Dalm*, 494 U.S. 596, 609 n.6 (1990); *Gen. Elec. Co. & Subs. v. United States*, 56 Fed. Cl. 488, 492 (2003), *aff'd*, 384 F.3d 1307 (Fed. Cir. 2004). Under this definition, it is appropriate to conclude that "overpayments" only arose in the years in which plaintiffs' payments exceeded their liability – the years, in other words, that their tax liability could actually be abated – which years were identified only as the IRS carried back the overall refund "owed" plaintiffs until fully exhausted in 1986. Under the settlement agreement, then, there were no abatements processed for 1980 through 1985, and thus no "overpayments" during those years upon which the interest provisions of section 6611 might attach.

Of course, refunds were made for 1986 through 1991 – years for which overpayments were recognized, but plaintiffs, nonetheless, did not receive interest. At first blush, it is difficult to reconcile this result with the basic notion that interest should be paid on "overpayments." And, this is no minor matter for plaintiffs, for owing to the passage of time, the amount of interest that would be paid on the refunds in these earlier years would be greater than that which was paid on the refunds in the later years. But, any approach that determines interest here by merely asking whether there was an overpayment for a given year is deficient – and, more importantly for our purposes, not "reasonable in the circumstances." Such an approach fails to account not only for the temporal limitations of the Code, and their normal effect in barring the assertion of stale claims, but also the prominent role those limitations played in causing the claim at issue to be resolved equitably in a fashion that interrelated and balanced the treatment of the refunds with that of the interest thereon. Divorcing the liberality of the former from the asserted conservativeness of the latter threatens to balkanize the determination of what is a reasonable interest provision here – to proceed as if there were no interdependence between the "principal" and interest calculation, so to speak, when it is apparent that those determinations were intimately related. To avoid such arbitrariness, the court must determine the reasonableness of the interest owed here by considering the underlying refund calculation. Those two concepts are inextricably intertwined. The question, in other words, is what would be reasonable under custom and usage if one considers the agreement as a whole – not the interest provision in a vacuum.

When the settlement agreement is viewed in this morphologic fashion, it is hard to deny that the IRS here offered plaintiffs greater refunds than they could have demanded under the Code. Indeed, every indication is that the mitigation provisions did not apply here at all – that is, the resolution of plaintiffs' refund claim did not result in double taxation of an item or in any of the other inequitable results enumerated in section 1312 of the Code, so as to trigger the relief offered by sections 1311-14 of the Code. *See Dalm*, 494 U.S. at 610; *Heineman v. United States*, 391 F.2d 648, 651 (Ct. Cl. 1968).[17]   Fortunately for plaintiffs, the IRS took a different view.  Had the IRS refused to invoke the mitigation provisions as it did, plaintiffs might have recovered as little as $5.79 (or perhaps nothing), making, by comparison, their ultimate recovery of $42,699.38, of which $6,534.36 was interest, more than reasonable under the circumstances – more, indeed, than what plaintiffs, in fact, claimed on their original and amended tax returns for 1997.

In short, the IRS' ultimate resolution of the interest issue – in which it allowed plaintiffs to receive interest on half of the years involved – reflects what the court believes is a reasonable basis upon which to supply the missing term in the agreement here.  The approach taken and the reasonable term to be supplied, in other words, are one in the same.  As defendant's performance thus coincided with its obligations under the settlement agreement, there was no breach.  *See San Carlos Irr. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (in order to demonstrate a breach of contract, a plaintiff must establish that defendant breached the duties and obligations created by the contract); *Spectrum Sciences v. United States*, 84 Fed. Cl. 716, 735 (2008).

## III.   CONCLUSION

The court will not gild the lily.  In the end, with its somewhat unusual facts, this case thus proves an exception to the familiar adage – "no good deed goes unpunished."  While the court is sympathetic to plaintiffs' feelings, that sentiment does not – and cannot – carry the day.  It remains that, with the missing term supplied, plaintiffs have received all the interest to which they are

---

[17]   By its terms, section 1311 applies only if there is a determination "described in one or more of the paragraphs of section 1312" of the Code.  26 U.S.C. § 1311(a).  The circumstances described in section 1312 include where there is: (i) the "[d]ouble inclusion of an item of gross income;" (ii) the "[d]ouble allowance of a deduction or credit;" (iii) the "[d]ouble exclusion of an item of gross income;" (iv) the "[d]ouble disallowance of a deduction or credit;" (v) certain correlative deductions for estates and related corporations; and (vi) the adjustment of the "[b]asis of property after erroneous treatment of a prior transaction."  26 U.S.C. § 1312.  In a refund suit, the taxpayer has the burden of demonstrating that one of these circumstances is present.  *See Last v. United States*, 37 Fed. Cl. 1, 7 (1996).  Generally, courts have disfavored the broad application of these provisions, concerned not to "overrid[e] Congress' judgment as to when equity requires that there be an exception to the limitations bar."  *Dalm*, 494 U.S. at 610; *see also Evans Trust v. United States*, 462 F.2d 521, 524 (Ct. Cl. 1972) ("This relief is limited to defined circumstances; the statute 'does not purport to permit the correction of all errors and inequities.'" (quoting *Brennen v. Comm'r of Internal Revenue*, 20 T.C. 495, 500 (1953))).

entitled under the agreement.  There is no breach of contract here and, therefore, no basis for any recovery.  The Clerk is directed to dismiss plaintiffs' complaint.  No costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge